GEORGE FOWLER and others, Respondents, *v.* THE NEW YORK GOLD EXCHANGE BANK, Appellant.

*Loan — what constitutes.*

The plaintiff agreed, September 23, 1869, to sell and deliver $50,000, in gold coin, to C. & Co. for $70,625, in currency, the gold to be delivered and the currency received September twenty-fourth. The parties were members of the Gold Exchange, under whose rules such contracts were to be cleared by the defendant, for which purpose notes of the transaction were to be delivered to the defendant by the vendor and vendee, and also the amounts paid over by the parties to the defendant. The defendant, distrusting its ability to settle the transactions of September twenty-third (Black Friday), requested its customers to settle their sales between themselves. The plaintiffs, therefore, did not deliver any notice of this transaction to the defendant, but C. & Co. did deliver such notice to the defendant, and also a notice of the transaction received by C. & Co. from the plaintiff, and also the currency to settle the transaction. The defendant thereupon, without notice from the plaintiff, paid the gold, called for by such transaction, to C. & Co. out of gold in its possession, without being put to any expense in procuring such gold. The plaintiff, very soon after the transaction was thus consummated, learned from C. & Co. of the manner of its settlement and immediately applied to the defendant for the amount of currency paid to it by C. & Co., offering to deliver to it the $50,000 in gold. The defendant, after taking time for consideration, replied to this application, that the affairs of the bank had passed into the hands of a receiver. The defendant, after a formal demand of the gold and tender of the currency, brought this action to recover the latter. *Held* (1), that the advancement of the gold was substantially a loan of it by the defendant to the plaintiff; (2), that, under the circumstances, the plaintiff had not been guilty of laches; (3), that, as it was not alleged in the answer that this gold had been purchased by the defendant, or that it had been put to any expense in procuring it, the defendant was not entitled to be allowed the depreciation in the price of gold during the interval between its payment to C. & Co. and the offer by the plaintiff to repay it; as if the gold had been retained by defendant, instead of being paid out to C. & Co., the same loss, by depreciation of its value, would have been sustained by it; (4), *semble* that a contract to pay for the difference in the market-price of gold, in case of a depreciation between the time of the loan and its re-payment, would have been usurious, and the law will not imply, as it will not tolerate its existence.

Appeal from a judgment rendered in the plaintiff's favor for $94,255.29, upon the report of a referee.

*Wm. H. Scott*, for the appellant.

*F. F. Marbury*, for the respondents.

Daniels, J.:

The principal controversy in this action arose out of a contract made on the 23d of September, 1869, by which James Brown & Co., who were gold and exchange brokers in the city of New York, for and on behalf of the plaintiffs, agreed to sell and deliver $50,000, in gold coin, to Chase, McClure & Co., another firm of brokers, who acted in the transaction for Chapin, Bowen & Co., who were also engaged in the same business, for the sum of $70,625 in currency. By the terms of the agreement made, the gold was to be delivered and the currency received, on the following day, the twenty-fourth of September.

These three firms of brokers were at the time members of the Gold Exchange of the city of New York; by one of whose rules or regulations the contracts of its members for the sale of gold were to be settled, or cleared, by the defendant. And to enable it to do that, intelligently, notes were delivered by the vendors and vendees, respectively, addressed to the cashier of the defendant, by which he was informed that the vendors would settle, through the clearing department of the bank, on a specified day, the amount of gold agreed to be sold; and the vendees, in like form, informed him of the currency they were to pay or deliver, as the price of the gold. On each day in which the members had settlements or exchanges of this nature, to be made through the intervention of the defendant, an account of all of them was also to be delivered to the defendant before half-past twelve o'clock in the day, and the amount of gold, or currency, as the case might require, necessary to balance all the transactions mentioned in the account, was also to be paid, or delivered with it, to the officers of the defendant. That enabled the defendant to clear or settle all the sales and purchases reported to it, and for which the notices had previously been given, by the respective parties, to the cashier.

Without the account and the deposit of the balance, and the notices to the cashier, the defendant did not undertake to clear and settle the sales made; but with them they were settled and cleared by the defendant by half-past one o'clock in the afternoon, and the balances found due, paid to the person or persons entitled to receive them.

The 24th of September, 1869, the day on which the contract

between Brown & Co. and Chase, McClure & Co. was to be by its terms performed, proved to be one of uncommon excitement among gold dealers, attended with very great and rapid fluctuations in prices, so much so that it has since been known and designated in that business as "Black Friday."

The president of the defendant, apparently distrusting its ability to settle and clear all the transactions, in gold, it probably might be called upon to balance and adjust, requested its customers, as far as they could conveniently do so, to consummate and settle their sales and purchases between themselves, without the interposition of the defendant. There was some uncertainty in the evidence concerning the existence of notice of this request, but it was of too slight a nature to leave it in any serious doubt, and the referee found it, as a fact, proved in the case. Brown & Co., the vendors of the gold on behalf of the plaintiffs, were informed of this request, and for that reason, neither delivered the notice received by them from Chase, McClure & Co. to the cashier of the defendant, nor the general statement or account of their transactions in gold which were to be cleared and settled on that day. And by reason of that omission, the defendant, by its course of dealings with its customers, the members of the Gold Exchange, was relieved from all obligations to settle and clear the sales and purchases of Brown & Co.

But Chapin, Bowen & Day, for whom Chase, McClure & Co. acted in making the purchase from Brown & Co., received the notice from them to the cashier, which Brown & Co. had delivered when the agreement was made, and delivered it to the cashier of the defendant, with an account of their transactions and the balance due, which was required to clear and settle them.

The defendant, in this way, received the $70,625 in currency, from Chapin, Bowen & Day, which Brown & Co. had contracted to receive for the $50,000 of gold coin, and without any further authority from Brown & Co. than that contained in their notice, given to Chase, McClure & Co., delivered the $50,000 in gold to Chapin, Bowen & Day, as their assignees or appointees. Neither the firm of Brown & Co., nor the plaintiffs acting through them, had any right to require the defendant to advance this gold, without placing the amount in its possession for that purpose,

and had no reason to expect that it would be done by it; nor had Chapin, Bowen & Day, under the circumstances, any valid or lawful claim upon the defendant for it, but the latter voluntarily paid it from the resources placed in its hands by its customers for the clearing and settling of other contracts for the sale of gold. The aggregate of this fund was very large, and it also had a large amount of gold on hand, in what was designated as its banking, in order to distinguish it from its clearing department. Whether the amount so advanced was actually required for other clearing or settling purposes during that day, or if it were, how the clearing department was reimbursed the amount, was not clearly disclosed by the case. If it were done at all, it was probably by withdrawing that amount from the fund of the banking department, because it was not even proposed to be shown that any loan for its reimbursement was made from any other source.

The evidence showed that Brown & Co. applied to Chase, McClure & Co. for a performance of the agreement made for the sale of the gold to them, and then ascertained that Brown & Co.'s notice to the cashier of the defendant had passed into the hands of Chapin, Bowen & Day, who had delivered it to the bank, with the currency required, and had received the gold from it. The precise time when this application was made does not clearly appear from the evidence, but it seems to have been very soon after the transaction was consummated by the defendant. Brown & Co. thereupon applied to the defendant for the currency it had received upon their contract, as the contract-price of the gold, and offered to deliver to it the $50,000 in gold. The officer to whom the application and offer were made reserved them for a conference with the president, or a committee, and for that reason returned no definite response to Brown & Co.; and, upon returning again a few days afterward for a reply, the member of the firm acting in its behalf was informed that nothing could be done by the committee or officers because the affairs of the bank had passed into the hands of a receiver, whose appointment appears to have been made on the twenty-ninth day of September. No want of diligence on the part of Brown & Co. appears to have attended their efforts to deliver the gold to Chase, McClure & Co., under the circumstances which the excitement and events of the twenty-

fourth of September brought into existence, or in their application to the defendant afterward to receive the gold and deliver them the currency. The request made by the president of the bank, that its customers should clear and settle their transactions, personally, without its intervening agency, must of necessity have been productive of some delay and embarrassment to those who endeavored to conform to it. And as Brown & Co. were among that class, they, of course, had to encounter the obstacles which the exigency of the occasion placed in their way, and for that reason could not be properly considered in default for not discovering more promptly than they did, what had been done by the way of performing their contract for the sale of the gold. The defendant's officers seem to have appreciated the existing condition of things, in their advancement of the gold, by their omission to claim any advantage from the failure of Brown & Co. to supply it before the time when that was offered to be done by them. Upon a similar view of the facts the plaintiffs, as the principals and assignees of Brown & Co., on the thirtieth of December, made a formal tender of the gold, and demanded the currency which Chapin, Bowen & Day had paid the defendant for it.

. That not being complied with this action was brought for the recovery of the amount, on the theory that the advancement of the gold was substantially a loan of it by the defendant to Brown & Co. for the plaintiffs ; and that view was taken of the transaction by the referee, under the evidence given upon the trial.

The defendant claims this to have been an erroneous determination of the case, insisting that the gold was procured and advanced for, instead of being loaned to Brown & Co. by the defendant. But in either view it could not be distinguished from a loan of the gold as long as nothing appears in the case authorizing the presumption that the defendant advanced it and received the currency for itself and upon its own account. A difference would, however, exist in its favor if the gold had been purchased by it, or procured from some other source by which it was subjected to expense on account of the transaction, in its conduct as agent for the plaintiffs or their brokers, Brown & Co. Upon the ratification of an act of that nature the principal would, probably, become bound to protect and fully reimburse the agent.

That the advancement of the gold was designed by the defendant to be a loan of it to the plaintiffs' brokers, Brown & Co., seems to be entirely clear from the facts admitted by the answer, and established also by the evidence.   The complaint contains the allegations that the defendant received the currency and advanced the gold to fulfill the contract made between Brown & Co. and Chase, McClure & Co., and as the agent and trustee of the plaintiffs.   The answer admits the receipt of the notice of Brown & Co. to its cashier, in which it was stated that they would settle through the clearing department on the 24th day of September, 1869, with Chase, McClure & Co., $70,625, currency for $50,000 gold; and that in pursuance of that notice, it did on that day deliver to Chapin, Bowen & Day, as assignees or appointees of Chase, McClure & Co., the $50,000 in gold coin, and received from them $70,625 in currency.   That was a substantial concession, that what was done in conformity with the notice, was performed by the bank at the instance of and for Brown & Co.   In the dealings of the bank with its customers, the notice was understood to be a request to settle and clear the transaction of which it contained a statement.   But it was not obligatory upon the bank without the account of the party it was expected to act for, and the funds requisite to adjust his balances When the bank acted in these matters, it was not for itself, but for its customers, and they were required to conform to its rules and business regulations before it could be expected to do so.   That, however, it was within the power of the bank to dispense with, and, under the peculiar circumstances existing at the time, it appears to have adopted that course, in the performance of the contract entered into for the sale and purchase of this gold.   On the part of the purchasers, a complete compliance with the defendant's rules was shown; and they supplied the evidence it deemed reliable of the obligation of Brown & Co. to deliver the gold.   They were its customers, and to fulfill their contract, and not its own, it delivered the gold.   That was paying out the gold for their customers' use, and in every practical sense a loan of it to them.   The notice operated as a request that the bank would deliver the gold for the currency, by the way of performing the agreement of Brown & Co., and it did precisely what was requested, without insisting upon what it

had a right to demand, that they should first place it in possession of the gold required to make the delivery. It was clearly a loan, and nothing more nor less than that, as the referee found and held it to be; and Brown & Co. fully ratified the defendant's act, in making it, by offering to refund the amount, and demanding the currency which Chapin, Bowen & Day paid for it. That was received for its customers by whom the notice or request was issued, and it was legally bound to pay it over, when its own demands arising out of the transaction were properly satisfied. Both the plaintiffs and their agents — Brown & Co. — when the nature of the transaction was understood, adopted the action of the defendant, and offered to deliver to it the amount of gold which had been advanced. And while it was not received, it was not refused on account of any asserted insufficiency in the amount. Gold was falling when the defendant advanced it, and the decline continued through the succeeding days in which these offers were made. And the defendant's officers may have declined to act at first for that reason. Whether they did or not is unimportant now, for the defendant has since resisted the effort made to recover the currency substantially for that reason.

In this connection it claimed on the trial that the difference in the price should be added to the amount of gold offered, because it was compelled to procure it for the accommodation of the plaintiffs. But it was not even alleged in its answer, or in any of the interviews shown by the evidence, when payment of the currency was demanded, that it had been subjected to any expense or trouble whatsoever in obtaining the gold delivered by it.

If a demand of that nature existed in its favor, it should, at least, have been disclosed as a claim when the answer was made to the plaintiffs' complaint. And yet nothing of that kind was alleged against either the plaintiffs or Brown & Co.; counter-claims or offsets were averred, but they in no respect embodied any demand for expenses in procuring or advances in purchasing the gold delivered to Chapin, Bowen & Day. It is not at all probable that the defendant was subjected to any such expense, or made any advances for the purchase or procurement of the gold. For it was clearly shown, and the referee found, that it was drawn from the amount held at the time by the defendant for clearing pur-

poses. It was not even alleged that it had been replaced as a part of its clearing fund. And if it had been, it was probably done by withdrawing an equivalent amount from the gold of the bank, by way of accommodation for its customers. The interval during which the replacing of the amount may have been necessary was very brief — even if it could have been at all required — before Brown & Co. offered the gold and requested payment of the currency. In no view can it be reasonably concluded that the defendant had been subjected to any loss in the transaction, beyond that resulting from the depreciation in the price of gold; and that, it would have encountered, by continuing to hold the gold it had on hand in its banking department, if it had not used it to refund the loan made in this case. A question was asked one of the defendant's witnesses, based upon the possible assumption that a loss had been sustained by the bank arising out of its use of gold held by it for clearing purposes. He was inquired of, whether he could state the cost to the bank of the gold which came into the clearing department on the 24th of September, 1869, so far as any portion of it was used in the settlement of contracts with any dealer in the clearing department. This question was objected to, and the answer excluded, because no claim of that nature had been alleged in the answer; and the defendant excepted to the referee's decision on the subject. If any loss of the kind contemplated. by the inquiry had been sustained, it should have been averred to entitle the defendant to make proof of it. The Code is explicit upon this subject, and it requires a counterclaim, as this certainly was, if it had any existence whatever, to be stated in the answer, before proof can be given of it upon the trial. (Code, § 149.) The answer to the plaintiff's complaint contained nothing from which it could by any possibility be inferred that any such claim was intended to be urged upon the trial of the cause. For that reason the referee was justified in excluding the inquiry proposed. The answer did show that the value of gold. had greatly declined between the time when the loan was made for the clearing and settling of the contract, and the day when the plaintiffs made the tender of its return. But this was a difference which the defendant could not recover. All that it was entitled to demand was the amount of gold it had advanced, with interest for

the period intervening between the loan and the offer of payment made. The law, and the course of business as it was shown upon the trial, coincided in this respect. As the market existed at the time, it was the loan of a commodity which was the subject of speculation and trade; and the obligation implied from the transaction was, that the loan should be returned in specie, with the interest in the mean time accruing upon it. If gold had appreciated in value during the interval the advantage resulting from that circumstance would have been exclusively the defendant's. The plaintiff could have derived no possible benefit from it, because the obligation was to return the same amount of gold they had received. For the same reason, the risk of depreciation rested upon the defendant. The contract implied from the transaction was, that the defendant should be returned in kind what it had advanced. And it had the power to protect itself against substantial or needless loss, from depreciation in price, by at once notifying Brown & Co. of what it had done to settle and clear their contract, and requiring that the gold used should be immediately refunded by them. But that it did not do; apparently electing to credit them, for the time being, with the amount. It did nothing requiring payment from them. The application to refund the gold, on the contrary, was made by them when the advance made of it by the defendant was ascertained, and its indecision on the subject of receiving it, must have increased the loss, resulting from the depreciation in the price of it. The defendant volunteered its friendly offices for the performance of the contract of Brown & Co., when it was not required by its own rules and regulations to act at all, simply by way of accommodating its customers, and all it could require, in return for what it did, was repayment for the gold paid out as soon as that could be reasonably made by the involuntary borrowers, and that was offered by them with a degree of promptness that excluded the imputation of neglect or failure upon their part. A contract to pay for the difference in the market-price of gold, in case of a depreciation between the loan and the time of payment, would have been usurious, and the law will not imply, as it would not tolerate its existence. The defendant's claim for it was properly rejected by the referee. The defendant was not bound to advance it at all. It had the right, and such was its

course of dealing, to decline to act in the transaction unless Brown & Co. first placed the gold in its hands which was required for clearing the contract. It did not do that, but, without being obliged to do so, advanced the gold for them to perform their agreement, apparently relying upon their subsequent payment of the advance made. It gave Brown & Co. a credit by doing so, which they made timely proposals to satisfy, but which the defendant, by its conduct, declined to accept. Its answer concedes that it acted alone for them, and upon their offer to return the gold, as long as nothing further was demanded at the time, by way of interest, they were entitled to the currency which the defendant had received for them in the course of the performance of their contract. If their offers were in any respect defective the defects were obviated by the formal tender of the plaintiffs on the thirtieth of December, when the refusal to deliver the currency was placed on the sole ground that a receiver had been appointed of the effects of the bank; and after that the refusal was not justified because the offers or tender of the gold were defective, but because of claims made by it against Brown & Co., exceeding the amount of the currency, and arising out of other transactions. One of these was a contract to purchase $105,000 in gold for $157,500 in currency by Brown & Co. from Dakin & Gillespy, for which the notice of Brown & Co. to the cashier was delivered to the defendant; and it claimed to have advanced the currency required to complete the purchase, and for that to have a claim against Brown & Co. which should be allowed them in this action. But the evidence established the fact so clearly, that this contract was not settled or cleared through the agency of the defendant, that it was abandoned and withdrawn during the progress of the trial.

Another, and the only other alleged, was for money advanced in settling and clearing a purchase of $20,000 of gold from R. W. Martin & Co. for $28,625 in currency. The defendant averred that it had advanced the currency to clear and settle this purchase. But the evidence given to prove the fact, upon its part, was exceedingly infirm and unsatisfactory, while on the part of the plaintiffs, it was shown that the president of the bank had given notice of his desire that parties having contracts to clear and settle on the 24th of September, 1869, should do the business

themselves, as much as they could, without the defendants' agency; and that this contract was settled and cleared by the parties to it outside the bank. The evidence was quite satisfactory that this particular transaction was stricken from the general statement or account of Martin & Co., by an officer of the bank, for the reason that Brown & Co. had omitted to send in the notice or ticket addressed to the cashier and received by them; or an account of their contracts which required clearing, or the funds needed for that purpose; and that it was settled between the parties personally. Direct and positive evidence was given in support of these facts, and that the defendant had no agency, and advanced no money, in the adjustment of this agreement. The preponderance was very decidedly with the plaintiffs, and the referee found in their favor upon it. The notice of Brown & Co., delivered to Martin & Co., that they would settle the transaction through the bank, was delivered to it, and remained in its possession. But, beyond receiving and retaining that, it was shown, with reasonable clearness, that it had nothing whatever to do with the receipt of the gold or the payment of the currency for it. That was settled between Brown & Co. and Martin & Co., without any agency or participation on the part of the defendant, and it consequently had no claim arising out of that transaction. The referee's decision upon that subject must be accepted as controlling. The only grounds upon which the plaintiffs' demand for the currency, received by the defendant for the $50,000 advanced by it, has been resisted, are its asserted right to indemnity for the depreciation in the market-price of gold, and the counter-claims already considered. Upon the latter, as it advanced nothing, it can be allowed nothing. Its defenses have been pressed with great ability and ingenuity, but the facts are found to be wanting on which they have been presented. As no reason exists for interfering with the judgment, it should be affirmed.

DAVIS, P. J., and BRADY, J., concurred.

Judgment affirmed.